1.

68

12/20/0

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OHIO CASUALTY GROUP, as subrogee of Eric Staub,<br>  Plaintiff | : : : | |
| v. | : | CIVIL ACTION NO. 1:CV-01-0785<br>(Judge Kane) |
| J & J INVESTMENT,<br>J & J INVESTMENT MANAGEMENT COMPANY,<br>  Defendant and<br>  Third-Party Plaintiff | : : : : | |
| v. | : | |
| AL BUDROW and RICHARD EDWARD WONDERS, t/a Wonders General Contracting,<br>  Third-Party Defendants | : : : | |

FILED
HARRISBURG, PA
DEC 19 2002

TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
MR. HUNT'S CLOSING ARGUMENT

Before: Hon. Yvette Kane, Judge
        and a Jury
Date:   December 12, 2002

Place:  Courtroom No. 4
        Federal Building
        Harrisburg, Pa.

COUNSEL PRESENT:

   HAYES A. HUNT, Esquire
       For - Plaintiff
   MARTIN A. DURKIN, JR., Esquire
       For - Defendant
   THOMAS R. NELL, Esquire
       For - Thirty-Party Defendant Al Budrow
   MICHAEL B. SCHEIB, Esquire
       For - Third-Party Defendant Richard Edward Wonders

Monica L. Zamiska, RPR
Official Court Reporter

1    MR. HUNT: Thank you, Your Honor. May I? Ladies
2 and gentlemen of the jury, I wanted to thank you for your
3 time and effort, being away from your family and work during
4 this time and then serving as jurors, to start out by saying
5 that.
6    And there is a couple things, at the beginning of
7 the case I remember asking you in voir dire whether or not it
8 mattered that the plaintiff was an insurance company. You
9 all raised your hand and said no. Well, the judge is also
10 going to instruct you that the fact that the plaintiff is an
11 insurance company shouldn't affect in any way your ability to
12 decide this case, and that really is not what this case is
13 about, whether or not there is an insurance company.
14    And I didn't think to ask you at the beginning of
15 the case, but I think you understand that the fact that I'm
16 from Philadelphia, and if I knew that that mattered, I would
17 have asked you if that mattered to you, but I think you
18 understand that that doesn't matter when it comes to the
19 evidence and the facts of the case either.
20    And there has also been reference to whether or not
21 this is a federal case. Well, there is legal reasons it's a
22 federal case, and when you hear people talk about that,
23 consider that J & J Investment Management Company also
24 brought Mr. Wonders and Mr. Budrow, sued them in federal
25 court.

I want to talk to you about the role and the law that applies to Mr. Wonders and Mr. Budrow, and Her Honor will instruct you that when somebody agrees to render services which they recognize as necessary for the protection of other properties, then they have a duty to do those services in a reasonable manner.

What do we know from Mr. Wonders' testimony? Mr. Wonders says in January he goes to the property, he sees the door that is kicked in, and to solve that problem he put three screws in the wooden door of the rear door. And he said in January he would tell Mr. Giambalvo of that problem. And the rear door was being unsecured, and then you saw the receipt from January 2000 that was created much after that.

Well, he gets a call from Mr. Giambalvo, and Mr. Wonders goes back to the property because there is an immediate concern about trash and debris on the property. He goes back, and he finds that the door, the same door that he had secured in January, had been kicked in again. Well, how reasonable is it, as he said, to do the exact same thing that was insufficient at the time in January, the exact same circumstances? Now it's the second time he's aware that people are going in and out of this property. He does the exact same thing. He tells you he puts three screws on the same wooden door that had already been kicked in. That's the second time. That's as far as Mr. Wonders told you his

1    involvement in the property was.

2             If you listen to what Mr. Budrow said, Mr. Budrow
3    testified that there was a third time that they went to the
4    property, and they went together.  Now Mr. Wonders said, "I
5    don't remember at all going with Mr. Budrow."  Mr. Budrow had
6    a very specific recollection of what happened, and if you
7    remember what he said, the two of them went there, and how
8    did they get into the property?  And again this is mid May
9    before the fire, two weeks before the fire, how did they get
10   in the property?  Well, they had a key.  Mr. Budrow told you
11   Mr. Wonders had a key, a key that didn't work, and when they
12   went to the front door together, they simply had to push that
13   door open.  And they went in, and they found all that trash
14   and debris on the inside and the outside of the property.  So
15   at that point that's the third time Mr. Wonders had an
16   awareness that this property was open, not secure, and people
17   could get in.  Well, that was the first time Mr. Budrow
18   understood that the property was open and accessible, he
19   didn't need to get a key to get in.

20            Well, Mr. Budrow says that he came back to the
21   property after that for the second time.  Now he had a very
22   specific recollection about a key that didn't work on the
23   front door, but he didn't remember how he got in when he came
24   back.  He didn't remember having a key.  Do you think he went
25   through the back door?  Does that make sense?  And when he

5

1  got there that second time, that rear door was once again
2  kicked in.  At this point that's four instances of the
3  property being open for people to get in.  People can get in.
4          And what does Mr. Budrow do?  Well, it's clear, and
5  I think you saw it on the back wooden door, that at this
6  point it's been kicked in three times between January and
7  May.  That rear door has plywood on the top half.  Well,
8  obviously I don't think that door came like that.  I think it
9  makes common sense, doesn't it, that that's not how it looked
10 like  when they bought it from Lowe's or wherever?  Somebody
11 put that in there.  No one says they ever did that.  We don't
12 know how that got there.  We don't know why that plywood is
13 there.  But does common sense say that plywood is there for a
14 reason, because somebody was trying to make sure no one got
15 in the top?  Doesn't that make sense?
16         Well, Mr. Budrow going there once knows that the
17 property is open, and he finds that back door kicked in for
18 the third time.  And he can't even screw it.  I guess it's so
19 damaged he doesn't even bother to put screws into it.  But he
20 does put screws in the aluminum door on the outside, and then
21 he takes a piece of wire, pulls it through and wraps it to
22 the outside.  Well, the condition of that is pretty obvious.
23 If you're on the outside, you can just unwrap that, and that
24 wooden door will open, and you can get in.
25         Well, the time line was tough, and I really, I

1  tried to give you an exact time line of what happened before
2  the fire, but the problem is I can't do that.  I can't say
3  1776, 1864, 1941 because there is revisionist history from
4  all three of their testimony and they're creating receipts.
5         Now when Mr. Budrow left, he had an obligation to
6  go back there.  Now when did he leave, and that's a real
7  question about this, when did he leave?  In all likelihood
8  the work that Mr. Budrow and Mr. Wonders did at that property
9  happened either May 15, 16 or 17.  Why, and this is the part
10 I think is some of the more credible testimony of Mr.
11 Giambalvo that he called Inspector Dorm and told him that the
12 property had been -- the work had been done on May 17.  You
13 would think that you wouldn't make that call to a complaint
14 inspector if you had no idea that it was done.
15        Now you remember Mr. Wonders and Mr. Budrow both
16 denied ever telling that to Mr. Giambalvo.  They both denied
17 it.  Mr. Giambalvo made that call to Officer Dorm or
18 Inspector Dorm, and Inspector Dorm wrote that on his notes.
19 He said remove citation.
20        We go back to Mr. Wonders and Mr. Budrow because I
21 want you to keep that time line which makes more sense, that
22 property, that door looked like that and that debris was
23 there between nine and 11 days before the fire.
24        Now Mr. Wonders is going to say, "I washed my hands
25 of it.  I tried to put Mr. Giambalvo with Mr. Budrow.  I had

1  nothing to do with it." Well, at the very least, and he
2  didn't tell you that, he has the obligation to tell Mr.
3  Budrow when he's there, say, "Hey, people are getting into
4  this property. The front door in January it was kicked in.
5  The back door was kicked in in January, the back door was
6  kicked in in May, and the door was open when we went there,
7  make absolutely certain and be sure that this problem is
8  taken care of," but he said he didn't tell him that. He's
9  got an obligation to reasonably tell him that.
10      Now if you want to talk about employees or
11 contractors and subcontractors between Mr. Wonders and Mr.
12 Budrow, it's very simple, all you have got to do is follow
13 the money. The receipts are from Wonders Contracting, and
14 Mr. Wonders paid Mr. Budrow with his own check. You just
15 have to follow the money. If people are working for you, you
16 pay them, you write them a paycheck, you give them the money.
17 It's very simple. There is no distinction between that.
18      Who was working for who? Mr. Budrow was working
19 for Mr. Wonders. That makes sense. That's why he paid him.
20 You don't pay people that don't work for you.
21      Now, as I said, when people render services which
22 they recognize as necessary for the protection of other
23 property, did they recognize that? Well, they both said they
24 did recognize that they had to do work for the protection of
25 the property. Do you remember when I asked them, "When you

1   work on vacant properties, do you understand that there is a
2   concern that people are getting in and out of it?"  And they
3   both said, "Yes, we know that.  In fact we know, we're
4   concerned about children getting in there," the same children
5   that Annette Price talked about running around, you know, the
6   whole neighborhood.  They recognize that service was
7   necessary for the protection of that property and other
8   property because that's foreseeable.
9            Now let me talk to you about Mr. Giambalvo, and Her
10  Honor is going to tell you that an owner of property has to
11  use reasonable care in the maintenance of his property, and
12  he can be found negligent by maintaining the property in a
13  state of disrepair.  And when she says that, please listen
14  carefully to a state of disrepair.
15           What you have seen is trash piles, and I don't
16  think I need to keep throwing these at, you know, spend the
17  whole time running back and forth to the board.  So you have
18  seen these pictures of how much trash and debris existed.
19  Does that look like it was in a state of disrepair?  Well, he
20  knows it's in a state of disrepair in January because Mr.
21  Wonders told him that, told him he had to resecure the door.
22           What happens on May 11?  On May 11 he gets a letter
23  from Inspector Dorm.  It's dated May 10, but he gets it on
24  May 11, that makes sense.  He gets it, and in it he's gotten
25  put on notice.  He makes a call to Mr. Wonders and says, "I

1  need you to take care of this immediately because I'm subject
2  to a thousand dollar a day fine." Five days after May 10 is
3  May 15, you have seen those receipts, and you know about
4  them, but in that it specifically references Section 305.1.
5  Now Her Honor is going to tell you that 305.1 is
6  evidence of the reasonable standard of care because it was
7  adopted as part of a governmental code. So when you hear
8  that instruction 305.1, and you know what it says because
9  I'll repeat it, it says you can't have an accumulation of
10 rubbish and debris on the exterior or interior of your
11 property.
12 Well, we know that happened for either nine or 11
13 days that rubbish and debris stayed in that property, and
14 when she tells you that it can be used as the standard of
15 care, understand that Inspector Dorm told you if that debris
16 or piles of trash, all that stuff you saw in the backyard, if
17 that was inside, that was a violation of 305.1. And it's one
18 thing to say that after the fact, you know, 305.1 applies to
19 some legal standard out there, but when 305.1 is in that
20 owner's hand, when Mr. Giambalvo has it, and he's a lawyer,
21 he can read it, it says interior and exterior, what does he
22 do in that nine or 11 days? Does he make sure and say,
23 "Look, there is a real problem here. I read this to say I
24 have to get my outside and inside of my property cleaned out.
25 I need this taken care of immediately. I need to contact

1  Waste Management. I need to use the resources of my car
2  dealership. This has to be done." He doesn't do that. He
3  picks up the phone on May 17 and says, "The work is done.
4  Remove the complaint." And the complaint, as you remember,
5  as Inspector Dorm told you, was for 305.1. And listen to
6  that jury instruction from Her Honor very carefully.
7       Now we talked about what happened, that property
8  sat, Mr. Budrow didn't get a dumpster, no one made
9  arrangements to remove these things from the interior, and
10 then the fire happens on May 26. And when Mr. Giambalvo was
11 asked, you know, "How did you feel after the fire?", he
12 appeared to be emotional, and, you know, I leave that to you
13 to determine how persuasive that was when he talked about
14 that.
15      But what did he do not on the stand when he talked
16 about how he felt about the fire, but what did he do after
17 the fire back after May of 2000? Well, he acted
18 deliberately, and he was calculated throughout.
19      When Officer Cromer asked him about the property
20 and the security and maintenance, Mr. Giambalvo said that, "I
21 was unaware that was unsecured." Well, that doesn't comport
22 with what Mr. Wonders said because Mr. Wonders said that he
23 told him in January and May that he had to keep securing that
24 rear door. That's what Mr. Wonders said. Mr. Giambalvo
25 said, "I was unaware that was unsecured." Do you think at

that point he'd say something to Officer Cromer? "Oh, you know what, I have been told twice already that that rear door keeps getting kicked in." He didn't say that. Deliberate and calculated.

Now after that, and there has been a lot of talk about it, you have seen the letterhead of my office, there was a letter sent to him and other letters from other people saying, "Hey, you know, it looks like your property was unsecured. It was in a state of disrepair," you know, putting them on notice that there were potential claims out there for other people that were injured as a result of your conduct. That's what a notice letter is. That's what those letters are. And when he gets that, what's he do? He talks to his insurance company. The insurance company says, "I need receipts."

Well, he goes in July 2000 and gets those receipts from Mr. Wonders, and they're backdated, and he gets them, and what does he do? It's one thing, and it might make sense, sometimes you don't get receipts for things, but do you tell somebody that you know what, do you send them a letter and say, "You know what, these are backdated. I didn't get them at the time, but the work was done."

On July 19 he gave Mr. Zedonis the two created receipts, and I think you know all about these receipts. You have seen them throughout, and I don't need to reiterate

them. The one talks about secured rear door. Do you think a contractor writes secured rear door that says, you know, put 3 inch screw nails there, do you do that? Or do you think that secured and that word that was used in there was actually related to the conversation that Giambalvo and Wonders had in July?

And if you're going to write a letter to Mr. Zedonis on July 19 talking to him about, "Here are the letters, here are the receipts that I'm providing you," at least tell him, don't you think that's reasonable to tell him that you backdated the receipts?

Well, on the stand, when I asked him, "This is the first time you have told anybody that these receipts are backdated," he said, "That's because nobody asked me to." Oh, would somebody think that they would backdate receipts like that? Does that make sense?

Now deliberate and calculated. There is also a third receipt that Wonders talked about. There is two receipts from May 15. Only two of them were here provided. There is a third receipt that we talked about, and that was shown to him by Mr. Zedonis that talked about all this other work that was performed amazingly dated May 15, 2000, amazingly for the same amount of money, for $350, but it had all these other things, all this other work that was performed. When asked about it, "Where is the receipt?" "I

1   don't know," but it was shown to him, and that's what Wonders
2   talked about. So there is another receipt. Deliberate and
3   calculated.
4       Now let's think about what the non-defendants
5   talked about. Annette Price talked about opening the door to
6   the property after it had been cleaned. Again on that time
7   line Annette Price said she was there at least a week or two
8   before the fire, and when she got there, the cleanup had been
9   done on the exterior of the property, and she said she was
10  curious when that door opened, and she went in there. Again
11  that shows how the property was in a state of disrepair.
12      Let's talk about Officer Cromer's testimony, and
13  let's get to May 26 and an inference of what happened. Well,
14  Officer Cromer investigated, talked to Mr. Giambalvo and Mr.
15  Budrow, and Officer Cromer did say that that screen door,
16  that aluminum door, was screwed in tight, the wooden door was
17  open, and that piece of wire, as you saw, was hanging from
18  the door. I'll show you that again. That's essentially how
19  that door looked on May 26 after the fire. (Indicating.)
20  Okay. Before that it looked like exactly how we explained, a
21  piece of wire wrapped, pulled shut. And Officer Cromer also
22  told you that that rear -- he was concerned about looking at
23  the bottom half of that aluminum door.
24      Now he already told you that the front door was
25  locked, we're not talking about the front door. I think the

1  front door's openness, as all these people talked about the
2  different times they walked in, shows you the condition of
3  the property, how it was maintained, that state of disrepair,
4  but talking about how the fire started, let's just deal with
5  the back door because that makes more sense. Somebody got in
6  through the back door, I don't think there is any dispute
7  about that.

8  So when they got there, all they did was unwrapped
9  the wire, that door opened, and as Officer Cromer said, that
10 opening on that aluminum screen door, that opening on the
11 aluminum screen door was large enough for him to get through,
12 and Officer Cromer was not small. I mean, you saw him
13 walking around, he is a taller man, and he said he could get
14 through that. Well, if he could get through that, the
15 children that Annette Price talked about could get through
16 that. Anyone could get through that. A six year old boy
17 could get through that, a 12 year old boy, anybody could get
18 through that.

19 Now when that person went through that opening,
20 they got inside the property. What did they find inside the
21 property, debris that shouldn't have been there because if
22 that condition was done in the way it should have under 305.1
23 and they would have gotten the dumpster and they would have
24 taken that debris out, that wouldn't have been there. And
25 Officer Cromer said somebody lit a match and put it right on

1   all that debris, and he said all that debris started on fire,
2   and because of the accumulation of debris, the spread and the
3   intensity of the fire was made even more -- the fire got, you
4   know, expanded and moved to the other properties very
5   quickly.  He told you how those burn patterns looked and how
6   bad that fire got.
7           Well, let's think about this, if they were
8   reasonable, if people had acted reasonably and kept up with
9   their property, that plywood that was there could have
10  secured that opening.  This opening should have never been
11  there, and if the opening is not there, somebody doesn't go
12  in.  For nine or 11 days they could have put a piece of wood
13  or done anything to secure that rear door in a more
14  appropriate manner instead of having a piece of wire hanging
15  off it that was obvious to the outside of how that door was
16  locked.  And then if they would have gotten a dumpster and
17  made arrangements to get that debris and trash out of there,
18  as Mr. Giambalvo was required to by the York property and
19  maintenance code, then somebody is -- even if this isn't
20  secure, somebody is inside but this property is clean, and
21  that match falls on nothing.
22          Her Honor is going to tell you what a preponderance
23  of evidence is, and I told you it's my burden of proof, and
24  all you have to do is put a scale.  And if it balances ever
25  so slightly in plaintiff's favor, then you find in favor of

1  the plaintiff.  Well, I want you to take that scale and take
2  one side of the scale and put that piece of plywood on it,
3  put that wire on it, put that aluminum screen door on it, put
4  the key that never worked on any of the front doors on that
5  side of the scale, put at least two receipts that we were
6  able to produce because they have weight, but let's say the
7  third receipt is May 15, put some weight on that too because
8  there is another receipt out there, put those three backdated
9  receipts on that scale, put the weight of these three
10 defendants' testimony and how the stories changed, put that
11 on the scale and then take all that trash and debris, take
12 all that trash and debris that you saw outside that was put
13 inside and put that on the scale, and when you do that,
14 you'll find that plaintiff has sustained its burden of proof.
15         I thank you again for your time, and hope you reach
16 a verdict in favor of the plaintiff.  Thank you.
17         THE COURT:  Thank you, Mr. Hunt.
18         (Mr. Hunt's closing argument concluded.)
19         I hereby certify that the proceedings and evidence
20 of the court are contained fully and accurately in the notes
21 taken by me on Mr. Hunt's closing argument of the within
22 cause and that this is a correct transcript of the same.

23         _____
24         Monica L. Zamiska, RPR
25         Official Court Reporter